JONES, Retired Justice.
The trial court granted the State ex rel. B. Kennon Goggans quo warranto relief by enjoining the defendants (Chambers County and the Chambers County Commissioners) from holding further elections in violation of Ala.Code 1975, § 17-9-5. That statute requires a county-wide referendum with respect to the discontinuance of the use of “Shoup” upright voting machines.
Both sides moved for a summary judgment. The trial court granted the relator’s motion and ordered that all subsequent elections must await the county-wide referendum prescribed by § 17-9-5. We set aside the judgment.
I.
The issue presented is whether the trial court erred in its ruling, which relied solely on § 17-9-5, a 1939 statute that required a county-wide referendum to authorize the use, and the discontinuance of the use, of voting machines. Or, stated otherwise, did the trial court err in not relying on the pertinent provisions of the 1983 Election Reform Act authorizing the governing body of any county or municipality, “by adoption of an appropriate resolution, [to] authorize, adopt, and direct the use of electronic vote counting systems for use in all elections”? § 17-24-3(a).
II.
The essential, undisputed facts, as garnered from the documents supporting the defendants’ motion for summary judgment, are summarized as follows:
Emerson W. Thompson has been the probate judge of Chambers County since 1983. His office is responsible for supervising elections held in Chambers County. The county’s Shoup upright voting machines were purchased before World War II and by the time of this lawsuit were in constant need of repairs. The maintenance technicians advised Judge Thompson in 1990 that if the Shoup machines were not replaced, they would require expensive repairs. At that time, Chambers County was incurring election costs of between $96,000 and $97,000 per year.
After the 1990 elections, Judge Thompson advised the Chambers County Commission of the problems with the voting machines and of the need to replace them or to make expensive repairs. The Commission instructed *198 Judge Thompson to investígate alternatives to using the Shoup machines for elections in Chambers County.
Judge Thompson learned from other probate judges that changing from the old machines to paper ballots and ballot scanners (i.e., to a centralized optical mark reading system, or “OMR” system) had resulted in faster, more accurate, and less expensive elections. Judge Thompson obtained information on the OMR system, as well as a projection of costs for Chambers County to use this system. AIS, the company from which the OMR system would be purchased, provided Chambers County with a cost list and demonstrated the use of the machine at a Chambers County Commission meeting. This meeting was open to the public.
The Chambers County Commission voted, five to one, to purchase the OMR system. No member of the public objected to the OMR system, either during the demonstration or during debate by the commission. The United States Justice Department pre-approved the change pursuant to the Voting Rights Act of 1965. The initial, one-time cost of the new OMR system was $32,930; the cost of printing the paper ballots for the system was approximately $40,000 per election. The life of a scanner is approximately 10 to 15 years, with no foreseeable maintenance problems. The OMR system was first used in Chambers County in the 1992 elections.
An election using the old Shoup machines required that voters wait in lines, sometimes long lines, before going into the machine, pulling the curtain behind them, and pulling the lever beside the names of the candidates of their choice. The votes were counted by a pollwatcher’s unlocking a panel at the back of the machine and reading a meter that recorded the votes. Although a second poll worker also reviewed the meter, the manual reading of 100 meters — Chambers County had 100 Shoup machines — left room for human error, so that, under the old system, if a recount was necessary, mistakes in the reading or recording of votes were often detected.
Use of the OMR system requires no voter waiting time. Each elector is given a ballot upon arriving at the polling location. The elector proceeds to an area where, privately, he or she fills out the ballot without the pressure of others waiting to vote. When the elector completes the paper ballot and places it in a gray paper “sleeve,” the elector then inserts the sleeve into the side of a locked steel box, and the ballot slides into the box. No one other than the elector touches the completed ballot up to this point. At the end of the election day, the steel boxes are taken to the probate judge’s office, where the ballot tabulation machine is located. The probate judge and four voting inspectors open the steel boxes and place the stacks of ballots in the scanner to be counted.
The accuracy of the new machine was demonstrated in one election in which two candidates for the same office were separated by only two votes and two candidates for another office were separated by only three votes. The “losing” candidates requested a recount; after a recount, the results were, to the vote, the same as the first results.
Judge Thompson was emphatic in his opinion that the one voting scanner, which replaced the 100 old voting machines, was a far superior system. The new system has reduced voting lines, it has allowed for obtaining election results faster, it has decreased human error, and it has increased accuracy. Election costs have been reduced by approximately 25%.
III.
We quote the pertinent portions of the 1975 Code that are dispositive of this appeal:
(1) From the 1939 Election Act:
“§ 17-9-5. Discontinuance of use.
“Any county or city may, by a majority vote of its qualified electors voting thereon at any election held not earlier than six years after the adoption and installation of such machines, direct the discontinuance of the use of voting machines at elections held in such county or city. The question of the discontinuance of the use of such voting machines shall be submitted to the voters, subject to the same requirements as to resolution or petition and signatures thereon as is required for the submission *199 of the question on the authorization of the use of such voting machines....”
(2) From the 1983 Election Act:
“§ 17-24-2. Definitions.
“For the purposes of this chapter, the following terms shall have the meanings respectively ascribed to them by this section:
“(1) Electronic vote counting system. A system in which votes are recorded on a paper ballot or on a ballot card by means of marking or by means of punching, and such votes are subsequently counted and tabulated by automatic tabulating equipment at one or more counting locations.
“(2) Automatic tabulating equipment. Such term shall include any apparatus necessary to examine and count automatically votes designated on ballots, and data processing machines which can be used for counting ballots and tabulating results.
“(3) Ballot. Such term shall include ballot cards, ballot labels, and paper ballots.
“(4) Ballot card. A ballot which is voted by the process of punching or marking.
“(5) Ballot label. A card, paper, booklet, or other material which contains the names of the offices and candidates and statements of questions to be voted on.
“(6) Committee. The Alabama Electronic Voting Committee.”
“§ 17-24-3. Requirements for approval of system.
“(a) The governing body of any county or municipality or other political subdivision of the state may, in its discretion, by adoption of an appropriate resolution, authorize, adopt, and direct the use of electronic vote counting systems for use in all elections held in such county or municipality or other political subdivision or any portion thereof....
“(b) Provided, however, that no such electronic vote counting system shall be used unless it has been constructed so that it shall:
“(1) Permit and require voting in secrecy.
“(2) Permit each elector to vote at any election for all persons and offices for whom and for which he or she is lawfully entitled to vote; to vote for as many persons for an office as he or she is entitled to vote for; and to vote for or against any question upon which he or she is entitled to vote.
“(3) Permit the voter at other than primary elections to vote a straight political party ticket in one operation.
“(4) Permit such automatic tabulating equipment to be set to reject all votes for any office or question when the number of votes therefor exceeds the number which the voter is entitled to cast or when the voter is not entitled to cast a vote for the office or question.
“(5) Be capable of correctly counting votes.
“(6) When used in primary elections, the automatic tabulating equipment will count only votes for the candidates of one party, reject all votes for an office when the number of votes therefor exceeds the number which the voter is entitled to cast, and reject all votes of a voter east for candidates of more than one party.
“(7) At presidential elections to permit each elector, by one operation, to vote for all presidential electors of a party or independent candidates for president or vice president.
“(8) Provide a method for write-in voting.
“(9) Be capable of accumulating a count of the specific number of ballots tallied for a precinct; and accumulating total votes by candidate for each office, and accumulating total votes for and against each question for such precinct.
“(10) Be capable of tallying votes from ballots of different political parties *200 from the same precinct, in the case of a primary election.
“(11) Be capable of automatically producing precinct vote totals in printed, marked, or punched form, or a combination thereof.
“(12) Be capable of accurately and correctly tabulating each vote and to have the same so certified.”
“§ 17-24-4. Electronic Voting Committee created; membership, compensation, etc.
“There is hereby created the Alabama Electronic Voting Committee which shall consist of five members. The committee shall consist of Secretary of State, a representative appointed by the Attorney General and one judge of probate appointed by the chief justice of the Supreme Court.... Additionally, one member from the House of Representatives and one member from the Senate, to be appointed by the presiding officer of each house.... ”
“§ 17-24-10. Provisions cumulative.
“The provisions of this chapter are cumulative and shall not be construed to repeal or supersede any provision of Chapter 9, Title 17, relating to voting equipment, unless in direct conflict herewith.”
“§ 17-24-11. Limitation on committee’s authority.
“The authority of the Alabama Electronic Voting Committee relative to voting equipment shall be limited to the electronic vote counting equipment authorized under the provisions of this chapter and such committee shall have no authority to examine, approve, disapprove or otherwise affect the use of voting equipment authorized under Chapter 9, Title 17.”
(3) From the 1993 Amendments:
“§ 17-24-20. Secretary of State may implement uniform system of electronic voting in certain counties.
“The Secretary of State may implement a uniform system of electronic voting in any county participating in the pilot project for establishing a uniform system of electronic voting provided for in Act No. 91-562.[1] The Secretary of State may provide through the pilot project for the administration, and educational support of a uniform system to enable counties to immediately and electronically obtain all vote totals, and to enable a county to immediately transfer by electronic means all election vote totals, and other totals from a participating county directly to the office of the Secretary of State on a timely and economic basis.”
“§ 17-24-21. Counties participating in project may be eligible to receive state funding.
“Any county participating in the pilot project may be eligible to receive funding from the state for 50 percent of the costs to lease purchase an electronic voting system for a period of not to exceed eight years from funds appropriated for election purposes which may accrue from savings in administrative and printing expense through the use of electronic voting....”
*201 “§ 17-24-22. Secretary of State may provide for orderly acceptance of counties requesting to participate; reimbursement.
“After the establishment of the uniform system of electronic voting through the implementation of the pilot project, the Secretary of State may provide for the orderly acceptance of counties requesting to participate in the state uniform system. ...”
IV.
The relator insists that the provisions of Chapter 24, Title 17 (specifically § 10 and § 11), do not detract from his major premise that both Chapter 24 (the 1983 Election Reform Act) and Chapter 9 (the 1939 Act) are entitled to be given full operative effect.
The defendants, on the other hand, insist that § 17-24-10, with the phrase “unless in direct conflict herewith,” solves the problem. The defendants contend:
“The direct conflict arises from the fact that § 17-24-3 gives express approval for the governing body of the county, in this case the Chambers County Commission, to implement an electronic vote-counting system ‘upon an appropriate resolution.’ No county-wide referendum is required. The 1939 law prohibited discontinuance of the use of voting machines without a countywide vote of approval; but the 1983 Act provided that a simple resolution of the county commission was sufficient to implement the new electronic voting system. Under anyone’s definition, this should be a ‘direct conflict’; thus allowing the 1983 Act to supersede the 1939 Act on discontinuance of one system and implementation of a new one....
“... [T]he use of voting machines was not discontinued; rather, the County Commission merely used a newer electronic vote-tabulating machine in lieu of the older model of upright voting machines ”
(Emphasis in the defendants’ brief.)
V.
We are persuaded to accept the position of the defendants. In authorizing the purchase and use of the electronic vote tabulator, the legislature clearly intended to retain Chapter 9, Title 17, if doing so meant the counting machine could be employed without effecting, in practical application, a “direct conflict” between the two statutes. If, however, the counting machine, as approved by the “Electronic Voting Committee,” was designed to accommodate both the casting of elector votes, as well as the tabulating of the vote totals, so that, in practical effect, the older machines could no longer be employed in the voting process, then a “direct conflict” exists between the provisions of § 17-9-5 (the 1939 Act) and the provisions of § 17-24-3 (the 1983 Election Reform Act). Consequently, the older election law gives way to the more recent legislative expression on the matter.
Moreover, the definitional section (§ 17-24-2) defines words and phrases (e.g., “ballot,” “ballot card,” and “ballot label”) that relate to the casting of votes; and the first four enumerated conditions of compliance of § 17-24-3 speak directly to the casting of votes, not to their counting. Additionally, in adopting §§ 17-24-20, -21, and -22, establishing the “Uniform System of Electronic Voting,” the legislature necessarily contemplated the change from Shoup upright voting machines to a uniform system of electronic voting, again, providing for the casting of votes, not merely for their counting.
VI.
For the reasons stated, the injunctive portion of the trial court’s judgment is set aside. That portion of the judgment requiring the defendants to post a $1,000 bond is also set aside, and, if payment has been made, repayment is hereby ordered.
This opinion was prepared by retired Justice Richard L. Jones, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala. Code 1975.
JUDGMENT SET ASIDE.
HOOPER, C.J., and MADDOX, ALMON, SHORES, HOUSTON, COOK, and BUTTS, JJ., concur.

. Ala. Acts 1991, No. 91-562:
“Section 1. The Secretary of State shall establish a pilot project designed to develop and test specifications for a uniform system of electronic voting in Alabama. The pilot project shall provide for the immediate electronic transfer of election totals and individual write-in votes as well as other totals from the various counties of the state to the Secretary of State’s office on a timely and economic basis. The project shall also study cost savings that could accrue to the state over a period of time by the reduction of printing costs that would be associated with the use of electronic equipment. The Secretary of State shall work with the various counties to determine which county or counties shall participate in the initial pilot project. Counties participating will assist in establishing the specifications for a uniform system of electronic voting and the electronic transfer of election totals.”
Because of the transitory nature of this 1991 amendment, it does not appear in the Code.